## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Jacqueline K. Penke,                                 Case No.:

       Plaintiff,                                **Jury Trial Demanded**

vs.                                                  **COMPLAINT**

Thomas G. Kloss, individually
and as an employee of the City
of Hutchinson, Minnesota; and
City of Hutchinson, Minnesota;

       Defendants.

_____

For her Complaint against defendants Thomas G. Kloss, individually and as an employee of the City of Hutchinson, Minnesota and the City of Hutchinson, Minnesota; plaintiff Jacqueline K. Penke, states and alleges as follows:

### INTRODUCTION

1.      This is an action for violation of 29 U.S.C. § 2601 (Family and Medical Leave Act of 1993); violation of Minn. Stat. Ch. 363A (Minnesota Human Rights Act); and negligent infliction of emotional distress for which plaintiff seeks judgment against defendants in an amount to be proven at trial, together with plaintiff's costs and reasonable attorneys' fees.

### PARTIES

2.      Plaintiff Jacqueline K. Penke (Plaintiff) is a citizen of McLeod County, Minnesota.  Plaintiff was employed with the City of Hutchinson, Minnesota from circa April 2001 until her discharge effective December 10, 2018.

3.     Defendant Thomas G. Kloss (Kloss) is a citizen of McLeod County, Minnesota.  Kloss is employed by the City of Hutchinson as its "Director of Information Technology" and, in such capacity, was at all times relevant Plaintiff's immediate supervisor.  The tortious conduct alleged against Kloss occurred in both his individual capacity and as an employee of the City of Hutchinson for which, under doctrines of, without limitation, *respondeat superior*, vicarious liability and/or agency, it is liable for Kloss' tortious conduct.

4.     Defendant City of Hutchinson, Minnesota (City) is an incorporated city in the State of Minnesota.  Under doctrines of, without limitation, *respondeat superior*, vicarious liability and/or agency, the City is liable for Kloss' tortious conduct alleged herein.  Unless referred to individually, defendants Kloss and City are collectively referred to as "Defendants."

## JURISDICTION AND VENUE

5.     This court has subject matter jurisdiction pursuant to 29 U.S.C. § 2601. Plaintiff further invokes this Court's pendant jurisdiction regarding her state law claims. Venue is proper in the District of Minnesota.  28 U.S.C. § 1391(b)(2)(3).

## FACTS

### Plaintiff's Outstanding Job Performance History.

6.     Circa April 2001, Plaintiff commenced her employment with the City as a "Computer/Network Technician."   As the City's Director of Information Technology, Kloss was Plaintiff's immediate supervisor.

7.      In his May 6, 2002 Memorandum regarding Plaintiff's initial annual job performance review, Kloss wrote to City Administrator Gary Plotz,

> I have completed [Plaintiff's] performance review as her one-year anniversary was on April 15th.  During her first-year ***[Plaintiff] has performed well beyond my expectations*** and therefore I am requesting that her pay rate be adjusted from step four to step five.
>
> Attached is her performance review in which she received a satisfactory score in all aspects of her position.

(Emphasis).

8.      As detailed within Plaintiff's initial job performance review, Kloss described Plaintiff/her job performance as: a strong researcher, keen ability, ability to prioritize projects on an ever changing project list, keep[s] others informed in a timely manner, displays effective verbal communications skills, listens and comprehends well, exhibits a high degree of tact and consideration with others, displays a positive outlook and pleasant manner, works cooperatively in group situations, takes responsibility to help resolve conflicts, undertakes self-development activities on own initiative, seeks increased responsibilities beyond the normal scope of job, very resourceful, displays creativity and original thinking, contributes usable suggestions for improving work, developed innovative approaches and ideas, demonstrates high level of competency, decisions are on target, sound judgment skills, plans and organizes time efficiently, works in an organized manner, regularly displays commitment to excellence, works hard to build a positive team spirit and identity, gives constructive feedback to and accepts it from team members, puts the success of the team above own interests, demonstrates a high level of skill, troubleshoots technical problems independently, makes use of technology to improve her

productivity, keeps her technical skills current, etc.

9.     Kloss' initial May 2002 accolades regarding Plaintiff's job performance continued annually thereafter.

10.    In February 2014, Kloss described Plaintiff's 2013 job performance as "outstanding."

11.    In February 2015, Kloss described Plaintiff's 2014 job performance as "outstanding."

12.    In February 2016, Kloss described Plaintiff's 2015 job performance as "outstanding."

13.    In February of 2017, Kloss described Plaintiff's 2016 job performance as "outstanding."

### *Kloss and Kloss.*

14.    Circa 2012, Kloss started to openly discuss his increasingly contentious marital problems while working with Plaintiff; marital problems culminating with his 2013 divorce.  *In re the Marriage of Nicole Marie Kloss and Thomas Gerald Kloss*, Meeker County District Court File Number 47-FA-13-588 (*Kloss and Kloss*).

15.    Following the conclusion of *Kloss and Kloss* and continuing, Kloss' life became increasingly occupied with post-divorce issues involving his ex-wife and children, issues he openly discussed with Plaintiff in the workplace.  Kloss would recurrently call Plaintiff into his office to discuss the same, with such discussions occasionally ending in tears.

16.     During this timeframe and continuing, the "tone" of Kloss' recurring discussions involving his ex-wife became increasingly bitter with his increasingly referring to his ex-wife as a "b***h" and/or other gender-based profanities.

17.     In 2014, Kloss disclosed to Plaintiff that his daughters had ceased having contact with him and that his efforts to restore such relationship were proving futile amidst allegations of his being emotionally abusive.  In turn, the tone of Kloss' recurring discussions involving his ex-wife *and now* daughters became increasingly bitter.

18.     In June 2016, Kloss disclosed to Plaintiff that he was not invited to his daughter's wedding.  In turn, the tone of Kloss' recurring discussions involving his ex-wife and daughters further digressed from mere bitterness to overt hostility, hostility that was gender-based.

19.     In late 2016, Kloss disclosed to Plaintiff that he had not met his newborn grandson.  In turn, Kloss' recurrently voiced, gender-based hostility toward his ex-wife and daughters increased.

20.     In November 2017, Kloss disclosed to Plaintiff that his eldest daughter moved to Florida with her family.  Thereafter, his ex-wife and youngest daughter also moved to Florida.  In turn, Kloss' recurrently voiced, gender-based hostility toward his ex-wife and daughters increased.

### *Kloss and Kloss* Adversely Affects Kloss' Behavior at Work.

21.     During this timeframe and continuing, lingering issues related to *Kloss and Kloss* were adversely affecting Kloss' behavior at work with his increasingly exhibiting emotional "mood-swings" while recurrently voicing gender-based hostility toward his ex-

wife and daughters.

22.     In view of Kloss' erratic emotional behavior including comments made regarding whether it was "worth moving forward," Plaintiff believed he might be suicidal. In turn, Plaintiff brought her concerns regarding Kloss' well-being to the City's Human Resources Department.  In turn, Kloss conceded having sought professional help.

### Transference of Kloss' Gender-Based Hostility Toward Plaintiff.

23.     During this timeframe and continuing, the lingering issues related to *Kloss and Kloss* were also adversely affecting Kloss' longstanding relationship with and behavior toward Plaintiff.

24.     Kloss not only continued to voice gender-based hostility toward his ex-wife and daughters, he increasingly exhibited similar behavior toward Plaintiff thereby rendering her a surrogate target of such hostility.

25.     Kloss' behavior toward Plaintiff went from his being approachable to dismissive, collaborative to reclusive, easy-going to irritable, patient to impatient, respectful to disrespectful, and friendly and calm to angry and hostile.

26.     Kloss' gender-based hostility toward his ex-wife and daughters, now redirected toward Plaintiff, often coincided with Plaintiff's participation in and enjoyment of significant family-related events.  Whereas Plaintiff was happily married, possessed healthy relationships with her children and regularly participated in family-related events; in contrast, Kloss was divorced, estranged from his ex-wife and children, and repeatedly complained of being excluded from family-related events.  In turn, such "contrast" further fueled Kloss' redirected gender-based hostility toward Plaintiff.

27.     By its frequency, duration and adverse impact upon the workplace, Kloss' redirected gender-based hostility toward Plaintiff was severe and pervasive.

**Plaintiff Applies for a Different Position; Retaliation Ensues.**

28.     In May 2017, in order to separate herself from Kloss' ongoing redirected gender-based hostility, Plaintiff applied for a different position within the City.

29.     Following his becoming aware of Plaintiff's seeking a different position, Kloss' hostility toward Plaintiff worsened considerably.

30.     Following his becoming aware of Plaintiff's seeking a different position, Kloss falsely accused Plaintiff of so-called "time-theft" by alleging she had claimed "comp-time" despite documentary corroboration that she had not done so.  Kloss made no such allegations against Plaintiff's similarly situated male co-workers.  Kloss rebuked Plaintiff's efforts to address his false allegations.

31.     Following his becoming aware of Plaintiff's seeking a different position, concurrent with Plaintiff's requesting family-related leave, vacation and/or her returning therefrom, Kloss also transferred several essential job functions for which she had been longstanding and solely responsible with such transfers going to younger, less experienced female staff, in turn, causing a number of residual problems.  As with his rebuking Plaintiff's efforts to address his false allegations of time-theft, Kloss rebuked Plaintiff's efforts to address the problems resulting from his transfer of such functions.

32.     Kloss' actions toward Plaintiff not only dissuaded her from requesting additional leaves of absence, his actions in transferring multiple essential job functions, the problems resulting therefrom and his refusal to address the same disrupted Plaintiff's

longstanding ability to perform her job in the manner previously performed.

33.     Following his becoming aware of Plaintiff's seeking a different position, Kloss also falsely accused Plaintiff of not communicating her whereabouts despite email corroboration she had done so.  As with his rebuking Plaintiff's efforts to address his false allegations of time-theft and the problems resulting from his transfer of multiple essential job functions, Kloss rebuked Plaintiff's efforts to address his false accusations regarding her communicating her whereabouts.

34.     Kloss' actions in falsely accusing Plaintiff of time-theft, his transferring multiple essential job functions, his falsely accusing Plaintiff of not communicating her whereabouts and his treating Plaintiff disparately from other male and/or younger, less experienced female co-workers were in direct retaliation for Plaintiff's seeking a different position to separate herself from Kloss' ongoing redirected gender-based hostility.

35.     By their frequency, duration and adverse impact upon the workplace, Kloss' retaliatory actions toward Plaintiff were severe and pervasive.

36.     Kloss' retaliatory actions toward Plaintiff were in violation of the City's respective sexual harassment, respectful workplace and anti-retaliation policies.

**The City's Sexual Harassment, Respectful Workplace and Anti-Retaliation Policies.**

37.     The City's sexual harassment and respectful workplace policies generally provide:

> The City is committed to providing a work environment that is free of discrimination.  In keeping with this commitment, ***the City maintains a strict policy prohibiting unlawful harassment, including sexual harassment. Policies addressing sexual harassment and a respectful***

***workplace*** may be found in the appendix to this document.

Employee Handbook – Personnel Policy (Employee Handbook), § 35, p. 25.  (Emphasis).

38.   The City's Sexual Harassment Prevention Policy specifically provides, *inter alia*:

> In keeping with this commitment, ***the City maintains a strict policy prohibiting unlawful harassment, including sexual harassment.  This policy prohibits harassment in any form, including verbal and physical harassment.***
>
> ***
>
> Employees who feel that they have been victims of sexual harassment, or employees who are aware of such harassment, should immediately report their concerns to any of the following:
>
> 1. Immediate Supervisor
> 2. Department Director (if not immediate supervisor)
> 3. Human Resources Director
> 4. City Administrator

*Id*., Attachment A, Sexual Harassment Prevention Policy, pp. 26-27.  (Emphasis).

39.   The City's Respectful Workplace Policy specifically provides, *inter alia*:

> ***The intent of this policy is to provide general guidelines about the conduct that is and is not appropriate in the workplace.***  The City acknowledges that this policy cannot possibly predict all situations that might arise, and also recognizes that some employees are exposed to disrespectful behavior, and even violence, by the very nature of their jobs.

*Id*., Attachment B, Respectful Workplace Policy, pp. 29.  (Emphasis).

40.   To protect a complainant from retaliation, the City's Sexual Harassment Prevention Policy also specifically provides:

> ***The City*** of Hutchinson ***will not tolerate retaliation or intimidation directed towards anyone who makes a complaint.  Retaliation includes, but is not limited to, any form of intimidation, reprisal or harassment.***  Any individual

who retaliates against a person who testifies, assists, or participates in an investigation may be subject to disciplinary action up to and including termination.

*Id.*, Attachment A, Sexual Harassment Prevention Policy, Retaliation, p. 28. (Emphasis).

41.     To protect a complainant from retaliation, the City's Respectful Workplace Policy further provides:

> Consistent with the terms of applicable statutes and City personnel policies ***the City may discipline any individual who retaliates against any person who reports alleged violations of this policy.*** The City may also discipline any individual who retaliates against any participant in an investigation, proceeding or hearing relating to the report of alleged violations. ***Retaliation includes, but is not limited to, any form of intimidation, reprisal, or harassment.***

Employee Handbook, Attachment B, Respectful Workplace Policy, Retaliation, p. 32. (Emphasis).

**Plaintiff Confronts Kloss Regarding His Gender-Based Hostility.**

42.     On November 21, 2017, consistent with the City's protocols, Plaintiff emailed Kloss and requested a meeting in an attempt to resolve the ongoing issues with his behavior. On November 27, 2017, Kloss responded to Plaintiff's request.

43.     On November 28, 2017, Plaintiff reported Kloss' behavior to Human Resources Director Brenda Ewing and requested a meeting.

44.     On December 14, 2017, Plaintiff had an initial meeting with Ms. Ewing and Kloss to address the ongoing issues with Ms. Ewing facilitating the discussion.

45.     On January 10, 2018, Plaintiff had a second meeting with Ms. Ewing and Kloss to address the ongoing issues with Ms. Ewing again facilitating the discussion.

**Further Retaliation Ensues.**

46.    On January 29, 2018, in direct gender-based retaliation for Plaintiff's reporting his hostile behavior to Ms. Ewing and the foregoing meetings; Kloss issued a memo regarding work hours, the result of which was to no longer permit Plaintiff to complete assignments after hours and/or on weekends as he had customary permitted her to do for approximately ten-years prior. Kloss imposed no such restrictions against Plaintiff's male co-workers.

47.    Thereafter and continuing, whenever possible, Kloss effectively ignored Plaintiff; for example, instead of conversing with her, he would create a helpdesk ticket or email her.

48.    Plaintiff's efforts to have a verbal discussion with Kloss were tersely rebuked and/or on the rare occasions when they did converse, Kloss would condescendingly cut such conversation short. This occurred while Kloss concurrently engaged in further retaliatory actions by taking Plaintiff's essential job responsibilities away and giving them to younger female employees.

49.    During this timeframe, Plaintiff met with Ms. Ewing and informed her that she was unable to perform her job if Kloss refused to discuss her projects. Despite Ms. Ewing's efforts, Kloss' behavior in undermining Plaintiff's job responsibilities continued.

50.    On June 13, 2018, Kloss finally gave Plaintiff her 2017 annual performance review (albeit now several months late).

51.    *In marked contrast to all prior annual reviews* that lasted approximately fifteen-minutes, Plaintiff's June 13, 2018 review lasted approximately 1.5 hours and

resulted in her being given a poor review premised, in part, upon events purportedly transpiring *prior to April 2017 and continuing*. Both the change in the duration and disposition of such review were in direct gender-based retaliation for Plaintiff's reporting Kloss' hostile behavior to Ms. Ewing.

52.    *In marked contrast to all prior annual reviews and as a means of intimidation*, Kloss also attempted to tape-record Plaintiff's June 13, 2018 review (she refused). Kloss made no such request with Plaintiff's male co-workers. Kloss' attempt to tape record such review was in direct gender-based retaliation for Plaintiff's reporting Kloss' hostile behavior to Ms. Ewing.

53.    Kloss' actions toward Plaintiff incident to her June 13, 2018 annual review were not only in direct gender-based retaliation for Plaintiff's reporting Kloss' hostile behavior to Ms. Ewing, such actions were in violation of the City's respective sexual harassment, respectful workplace and anti-retaliation policies.

**The City Validates Kloss' Behavior Toward Plaintiff.**

54.    On June 13, 2018, Plaintiff wrote to and requested a meeting with the City's Administrator Matt Jaunich regarding Kloss' actions incident to her annual review.

55.    On June 19, 2018, Mr. Jaunich responded to Plaintiff by a memorandum stating, *inter alia*,

> First off, in regards to meeting with you to discuss your review, there needs to be an understanding that according to city policy, employee performance reviews are not an item that can be grieved by employees (personnel policy, Section 28). For you and I to meet and discuss it would be inappropriate and borderline in violation of city's Personnel Policy, especially since I am not your direct supervisor. ***The methods (or lack thereof) of which were used to conduct your performance review***

*(recording) now and in the past may have been a bit unorthodox, but are not in violation of any employee conduct.* As was your right, you objected to the recording and it appears your supervisor obliged with that request. *How your supervisor chooses to conduct your review is really up to him to determine.*

June 19, 2018 Memo from Matt Jaunich, City Administrator to Plaintiff. (Emphasis).

56.     City Administrator Jaunich's actions in requiring Plaintiff to address the issues she was encountering with Kloss *and only Kloss* (despite his being the very source of such issues) not only provided a wholly illusory recourse, by such actions the City tacitly validated Kloss' ongoing gender-based retaliation following Plaintiff's reporting his hostile behavior to Ms. Ewing.

57.     City Administrator Jaunich's actions in requiring Plaintiff to address the issues she was encountering with Kloss *and only Kloss* (despite his being the very source of such issues) not only provided a wholly illusory recourse and tacit validation of Kloss' ongoing retaliatory behavior toward Plaintiff, such actions were in violation of the City's respective sexual harassment, respectful workplace and anti-retaliation policies.

**Plaintiff Files a Formal Grievance; Plaintiff's Medical Leave of Absence; The City's "Sham" Investigation.**

58.     On June 25, 2018, Plaintiff filed a formal grievance against Kloss.

59.     Concurrently, due to the emotional toll incurred by Defendants' actions, Plaintiff requested and commenced a medical leave of absence.

60.     Thereafter, the City retained counsel to conduct an investigation into Plaintiff's grievance.

61.    On August 29, 2018, the City's investigator interviewed Plaintiff.  At the conclusion thereof, the City's investigator invited Plaintiff to provide any additional information she believed to be germane to the investigation.

62.    On August 31, 2018, Plaintiff provided additional information to the City's investigator with Plaintiff specifically stating,

> *"[a]gain, the primary reason I applied for the job [in May 2017] was to separate myself from all [Kloss'] personal issues he constantly brought to work and the increasing emotional abuse, harassment, etc*."

(Emphasis).

63.    Thereafter, despite Plaintiff's specifically informing the City's investigator of Kloss' injecting his personal issues into the workplace and the increasing emotional abuse, harassment, etc., the City's investigator did not pursue the issue with Plaintiff.

64.    By letter of September 26, 2018, City Administrator Jaunich informed Plaintiff that the City's investigator had concluded her investigation; "[t]he findings of the investigation did not substantiate any inappropriate conduct in the workplace or violations of city policy by … [Kloss]."

65.    As corroborated by, without limitation, the City's investigator's failure to pursue Plaintiff's specific allegations of Kloss' injecting his personal issues into the workplace and the increasing emotional abuse, harassment, etc., such investigation was pretextual in nature and calculated to create the impression of the City's taking prompt remedial action in response to Plaintiff's grievance (on the one hand), while concurrently ensuring such investigation's prospective findings and resulting conclusion would mitigate the City's liability to Plaintiff (on the other).

66.   By letter of September 28, 2018, Ms. Ewing informed Plaintiff that her request for a continuance of her personal leave had been approved by City Administrator Jaunich.  Concurrently, Ms. Ewing stated, "[a]t this time, if applicable, *we also invite you to meet with City Administration to discuss with us any work accommodations* you would have the City consider."  (Emphasis).

67.   By letter of October 4, 2018 to Ms. Ewing, Plaintiff's treating doctor addressed the nature and extent of Plaintiff's condition necessitating her ongoing leave of absence and, in turn, her prospects for returning to work.  Therein, Plaintiff's doctor stated,

> As addressed in my last letter, *due to the dynamics of the working relationship with her current supervisor triggering her disorders and related symptoms; [Plaintiff] is unable to return to work to work (sic) in her current position with her current supervisor.*  Since [Plaintiff] has acknowledged that she has some type of work that could move with her to a different area, *I suggest she attempt to return to work in a different position with a different supervisor/reporting structure while obtaining ongoing treatment without further interaction with her current supervisor.*  It is my professional opinion that [Plaintiff] would be much more capable of attempting a return to work for the City of Hutchinson under this scenario.

(Emphasis).

68.   By letter of October 5, 2018, Plaintiff's counsel wrote to City Administrator Jaunich regarding Ms. Ewing's September 28th reference to "work accommodations" and Plaintiff's doctor's October 4th recommendations (proposed solution) to Plaintiff's "return[ing] to work for the City of Hutchinson."

69.   In his responsive October 10, 2018 letter, City Administrator Jaunich stated,

> In reviewing the requests, please note that *there are currently no available positions for which [Plaintiff] is qualified, and we are not anticipating any positions to open in the foreseeable future.*  While we are aware that [Plaintiff's] Doctor has requested a change in her Supervisor, there is

currently no other position available to assign her to. In acknowledging that, we want to be able to consider and evaluate other possible solutions/accommodations outside of changing supervisors and are asking for your consideration in that.

(Emphasis).

70. On December 7, 2018, the parties unsuccessfully attempted to mediate Plaintiff's claims involving Defendants.

71. By letter of December 10, 2018, City Administrator Jaunich informed Plaintiff that her employment with the City was terminated effective such date.

## COUNT I

### VIOLATION OF 29 U.S.C. § 2601
### (FAMILY AND MEDICAL LEAVE ACT OF 1993 (FMLA))

72. Plaintiff restates and realleges paragraphs 1-71 of her Complaint as though fully set forth herein.

73. The law provides, *inter alia*, that ". . . an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: . . . (D) [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *See* 29 U.S.C. § 2612 (Leave requirement).

74. The law further provides, *inter alia*, that: "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *See* 29 U.S.C. 2615(a)(1) (Prohibited acts).

75. The law further provides, *inter alia*, that: "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for

opposing any practice made unlawful by this subchapter." *See* 29 U.S.C. 2615(a)(2) (Prohibited acts).

76.     As described in paragraphs 28-71 above, by their individual and/or collective conduct in retaliation for Plaintiff's seeking a different position due to Kloss' injecting his personal issues into the workplace and the increasing emotional abuse, harassment, etc.; Kloss' transferring several essential job functions for which Plaintiff had been longstanding and solely responsible concurrent with Plaintiff's requesting family-related leave and/or her returning therefrom; Plaintiff's filing a grievance against Kloss; Plaintiff's June 25, 2018 FMLA-based medical leave of absence; and the City's December 10, 2018 termination of Plaintiff's employment therewith, Defendants engaged in conduct against Plaintiff in violation of the FMLA.

77.     As a direct and proximate cause of Defendants violation of the FMLA, Plaintiff has sustained damages in an amount in excess of seventy-five thousand ($75,000.00) dollars.

## COUNT II

### VIOLATION OF MINN. STAT. § 363A.08
### (Minnesota Human Rights Act (MHRA))

78.     Plaintiff restates and realleges paragraphs 1-77 of her Complaint as though fully set forth herein.

79.     The MHRA provides, in pertinent part:

> *[I]t is an unfair employment practice for an employer*, because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, membership or activity in a local commission, disability, sexual orientation, or age *to ... discriminate against a person with respect to*

> ***hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.***

Minn. Stat. § 363A.08, subd. 2(3). (Emphasis).

80.     The MHRA defines "discrimination" to mean "segregate or separate, and for purposes of discrimination based on sex, it includes sexual harassment." Minn. Stat. § 363A.03, subd. 13.

81.     The MHRA states in pertinent part that,

> ***'Sexual harassment' includes unwelcome*** … ***verbal*** or physical ***conduct or communication of a sexual nature when:***
>
> (1) submission to that conduct or communication is made a term or condition, either explicitly or implicitly, of obtaining employment, public accommodations or public services, education, or housing;
>
> (2) ***submission to or rejection of that conduct or communication by an individual is used as a factor in decisions affecting that individual's employment***, …; or
>
> (3) ***that conduct or communication has the purpose or effect of substantially interfering with an individual's employment,*** … ***or creating an intimidating, hostile, or offensive employment,*** … ***environment.***

Minn. Stat. § 363A.03, subd. 43 (Sexual harassment). (Emphasis).

82.     Regarding its reprisal provisions, the MHRA further states in pertinent part that,

> ***It is an unfair discriminatory practice for any individual who participated in the alleged discrimination as a perpetrator, employer,*** …, ***or employee or agent thereof to intentionally engage in any reprisal against any person because that person***:
>
> (1) ***opposed a practice forbidden under this chapter*** …; or
>
> (2) associated with a person or group of persons who are disabled or who are of different race, color, creed, religion, sexual orientation, or national origin.

> *A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment. It is a reprisal for an employer to do any of the following with respect to an individual because that individual has engaged in the activities listed in clause (1) or (2):* refuse to hire the individual; *depart from any customary employment practice; transfer or assign the individual to a lesser position in terms of wages, hours, job classification, job security, or other employment status*; or inform another employer that the individual has engaged in the activities listed in clause (1) or (2).

Minn. Stat. § 363A.15, subd. 43 (REPRISALS).  (Emphasis).

83.    As described in paragraphs 14-71 above, by their individual and/or collective conduct in permitting Kloss to inject his marital problems into the workplace; Kloss' recurring gender-based references to his ex-wife as a "b***h" and/or other gender-based profanities; Kloss' recurrently voiced, gender-based hostility toward his ex-wife and daughters; Kloss' exhibiting similar gender-based hostility toward Plaintiff; Kloss' retaliating against Plaintiff for seeking a different position due to Kloss' injecting his personal issues into the workplace; Kloss' gender-based retaliation against Plaintiff for reporting his hostile behavior to Ms. Ewing; Kloss's no longer permitting Plaintiff to complete assignments after hours and/or on weekends as he had customary permitted her to do for approximately ten-years prior to Plaintiff's reporting his hostile behavior; Kloss' engaging in further retaliatory actions by taking Plaintiff's essential job responsibilities away and giving them to younger female employees; Kloss' continuing behavior in undermining Plaintiff's job responsibilities; Kloss' giving Plaintiff her 2017 annual performance review several months late; Kloss' changing the duration of Plaintiff's 2017 annual review from that of all prior annual reviews; Kloss' attempting to tape record Plaintiff's 2017 annual review; Kloss' giving Plaintiff a poor annual review premised, in

part, upon events purportedly transpiring fourteen months prior; Kloss' actions in falsely accusing Plaintiff of time-theft; Kloss' actions in falsely accusing Plaintiff of not communicating her whereabouts; the City's actions in acquiescing to Kloss' behavior by limiting Plaintiff's recourse to addressing such issues with Kloss *and only Kloss* (despite his being the very source of such issues); the City's actions in pursuing a sham investigation that failed to pursue Plaintiff's specific allegations emanating from Kloss' injecting his personal issues into the workplace; the City's failure to reasonably accommodate Plaintiff's need for a transfer; and the City's December 10, 2018 termination of Plaintiff's employment therewith, Defendants engaged in conduct against Plaintiff in violation of the MHRA.

84.   As a direct and proximate cause of Defendants violation of the MHRA, Plaintiff has sustained damages in an amount in excess of seventy-five thousand ($75,000.00) dollars.

## COUNT III

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

85.   Plaintiff restates and realleges paragraphs 1-84 of her Complaint as though fully set forth herein.

86.   As described in paragraphs 14-71 above, by their individual and/or collective conduct in permitting Kloss to inject his marital problems into the workplace; Kloss' recurring gender-based references to his ex-wife as a "b***h" and/or other gender-based profanities; Kloss' recurrently voiced, gender-based hostility toward his ex-wife and daughters; Kloss' exhibiting similar gender-based hostility toward Plaintiff; Kloss'

retaliating against Plaintiff for seeking a different position due to Kloss' injecting his personal issues into the workplace; Kloss' gender-based retaliation against Plaintiff for reporting his hostile behavior to Ms. Ewing; Kloss's no longer permitting Plaintiff to complete assignments after hours and/or on weekends as he had customary permitted her to do for approximately ten-years prior to Plaintiff's reporting his hostile behavior; Kloss' engaging in further retaliatory actions by taking Plaintiff's essential job responsibilities away and giving them to younger female employees; Kloss' continuing behavior in undermining Plaintiff's job responsibilities; Kloss' giving Plaintiff her 2017 annual performance review several months late; Kloss' changing the duration of Plaintiff's 2017 annual review from that of all prior annual reviews; Kloss' attempting to tape record Plaintiff's 2017 annual review; Kloss' giving Plaintiff a poor annual review premised, in part, upon events purportedly transpiring fourteen months prior; Kloss' actions in falsely accusing Plaintiff of time-theft; Kloss' actions in falsely accusing Plaintiff of not communicating her whereabouts; the City's actions in acquiescing to Kloss' behavior by limiting Plaintiff's recourse to addressing such issues with Kloss *and only Kloss* (despite his being the very source of such issues); the City's actions in pursuing a sham investigation that failed to pursue Plaintiff's specific allegations emanating from Kloss' injecting his personal issues into the workplace; the City's failure to reasonably accommodate Plaintiff's need for a transfer; and the City's December 10, 2018 termination of Plaintiff's employment therewith, Defendants engaged in conduct against Plaintiff in violation of the the City's respective sexual harassment, respectful workplace and anti-retaliation policies, the FMLA and the MHRA.

87.    Defendants' foregoing conduct toward Plaintiff was not only negligent, careless and reckless, such conduct proximately caused Plaintiff to seek a June 25, 2018 medical leave of absence and/or a continuation thereof during which Defendants received periodic updates regarding Plaintiff's medical condition and related treatment.

88.    Defendants' foregoing conduct toward Plaintiff continued, in part, following Plaintiff's June 25, 2018 medical leave of absence during which Defendants received periodic updates regarding Plaintiff's medical condition and related treatment.

89.    As a direct consequence of defendants' foregoing outrageous, tortious conduct, Plaintiff not only suffered severe emotional distress, she incurred medical expenses related thereto.

90.    As a direct and proximate cause of Defendant's negligent infliction of emotional distress, Plaintiff has sustained damages in an amount in excess of seventy-five thousand ($75,000.00) dollars.

## JURY DEMAND

Plaintiff respectfully demands trial by jury of all claims and issues as allowed pursuant to applicable law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Jacqueline K. Penke prays for judgment against defendants Thomas G. Kloss and the City of Hutchinson, Minnesota as follows:

1.    As to Count One, a money judgment against Defendants in an amount in excess of seventy-five thousand ($75,000.00) dollars;

2.    As to Count Two, a money judgment against Defendants in an amount in

excess of seventy-five thousand ($75,000.00) dollars;

3. As to Count Three, a money judgment against Defendants in an amount in
excess of seventy-five thousand ($75,000.00) dollars;

4. Plaintiff' costs, disbursements, reasonable attorney fees and prejudgment
interest; and

5. For such other and further relief as the court may deem just and equitable.

ROBERT GARDNER LAW

Dated: June 18, 2019

_____
Robert M. Gardner, #0234977
3265 19th Street N.W., Suite 625
Rochester, MN 55901
Phone: 651-927-9031
*robert@robertgardnerlaw.net*

Attorney for Plaintiff
Jacqueline K. Penke